THE WOMEN'S RESOURCE NET-WORK, Dana Serrano, and Kent Peters, Plaintiffs,

v.

Steven GOURLEY, in his capacity as Director of the Department of Motor Vehicles, Defendant.

Yosemite Foundation, California Department of Veterans Affairs, Intervenors.

No. CV S–03–0786 GEB PAN.

United States District Court, E.D. California.

Feb. 20, 2004.

Michael David Millen, Law Office of Michael Millen, Los Gatos, CA, for plaintiffs.

Kathryn Gimple, Attorney General's Office for the State of California, Sacramento, for Steven Gourley, Director of the Department of Motor Vehicles, defendant.

James E. Houpt, William T. Darden, Margaret Carew Toledo, Orrick, Herrington & Sutcliffe LLP, Sacramento, CA, for Yosemite Foundation.

## PERMANENT INJUNCTION

BURRELL, District Judge.

Plaintiffs move both for a permanent injunction and declaratory relief, seeking to invalidate numerous specialized license plates mounted on California motor vehicles. Plaintiffs contend these plates were issued through an unconstitutional, standardless statutory scheme which gives the California Legislature unbridled discretion to decide whether to authorize issuance of a plate. Each challenged plate was specifically authorized by statute. Plaintiffs state their lawsuit is brought against Defendant Steven Gourley in his official capacity as the Director of the Department of Motor Vehicles ("Gourley" or "DMV") because California has given Gourley authority to administer its license plate program. Plaintiffs seek to prevent Gourley from renewing license plates issued under the challenged statutes and from issuing any new license plate authorized by the Legislature under California Vehicle Code § 5060.[1] They also seek an order requiring Gourley to recall all plates previously issued under the statutes.

Plaintiffs commenced this lawsuit after plaintiff The Women's Resource Network ("WRN"), a private nonprofit organization, was unsuccessful in its attempts to have

---

1. All citations are to the California Vehicle Code unless otherwise stated.

the California Legislature enact an enabling statute which would have permitted Gourley to issue WRN's proposed "Choose Life" license plate. These attempts were made under § 5060, which opens a speech forum for nonprofit organizations to request issuance of license plates bearing specified messages and/or graphic designs.

Plaintiffs make a First Amendment facial challenge to each statute, arguing the statutes violate the First Amendment's viewpoint neutrality principle.[2] At issue is whether the Legislature's denial of WRN's request for a statute authorizing issuance of its proposed plate resulted from a legitimate exercise of its licensing authority or could have resulted from an " 'illegitimate abuse of censorial power.' " *The Tool Box v. Ogden City Corporation*, 355 F.3d 1236, 1241 (10th Cir.2004) (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)).

This motion is brought in the wake of a preliminary injunction ("PI"), issued in Plaintiffs' favor on September 4, 2003. The PI prevents the DMV from approving any new special interest license plate for a private nonprofit organization under § 5060's special interest license plate program. (PI at 27.) The PI upheld Plaintiffs' First Amendment facial challenge to § 5060, finding that the statute lacks standards to govern what expression is allowed, and thus could be used by the Legislature to suppress unpopular speech. *See Lakewood*, 486 U.S. at 758, 108 S.Ct. 2138.

## DISCUSSION

Plaintiffs' present motion seeks to invalidate 29 enabling statutes and the plates issued thereunder. The statutes are located in articles 8, 8.4 and 8.5 of California's Vehicle Code. Plaintiffs contend their motion should be granted without analysis of the speech in each statute or "the history and status of each plate," arguing that such analysis is unnecessary because the statutes embody private speech in a standardless private speech forum and therefore violate the First Amendment's viewpoint neutrality principle. (Pls.' Mot. at 15; Pls.' Reply at 5.) The DMV counters that the challenged speech is government speech "because California owns the license plates it issues," "controls what appears on them ...," and adopts a plate's message as its own when it authorizes a plate's issuance. (DMV's Opp'n at 1 and 11.)

■ Plaintiffs' First Amendment challenge should not be decided in a vacuum, absent consideration of the statutory enactments underlying the challenged speech. Analysis of speech fora is involved with a portion of Plaintiffs' challenge, and requires a determination whether California opened any of the challenged statutes for "a certain class of speakers." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). This determination is crucial because "the government [is encouraged] to open its property to some expressive activity in cases where, if [the government is] faced with an all-or-nothing choice, it might not open the property at all." *Id.* at 680, 118 S.Ct. 1633. Also, when deciding whether speech is fundamentally private or government speech, it should be determined whether a government program is involved with the speech, and whether the program effectu-

---

**2.** This is the only claim left in this action following Plaintiffs' filing on January 20, 2004, in which they abandoned all other claims. That filing responded to an Order requiring briefing on the remaining issues in Plaintiffs' First Amended Complaint ("Comp.").

ates government policy. *See generally Sons of Confederate Veterans, Inc. v. Commissioner of the Va. Dep't of Motor Vehicles*, 288 F.3d 610, 619 (4th Cir.2002) ("*SCV I*"); *see also Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1012 (9th Cir.2000) (finding that speech on school bulletin boards was government speech "[b]ecause the bulletin boards were a manifestation of the school board's policy ... and because [it] had final authority over the content of the bulletin boards ...."). Further, identification of the primary speaker is of paramount importance because, if the government is found to have engaged in authorized government speech, *curtailing* that speech could interfere with the government's sovereign functions, "for instance[,] to promote its own policies or to advance a particular idea...." *Bd. of Regents of Univ. of Wis. v. Southworth*, 529 U.S. 217, 235, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). Wrongful interference with legitimate government speech can demean a state's ability to effectuate its public policy. *See generally English v. Marin Mun. Water Dist.*, 66 Cal.App.3d 725, 730, 136 Cal.Rptr. 224 (1977) (indicating that California's legislative enactments reflect its public policy). For these reasons, the text of, and some legislative history for, the enabling statutes which govern the challenged speech is considered.

Defendants Yosemite Foundation a/k/a/ The Yosemite Fund ("Yosemite" or "Yosemite Foundation") and California Department of Veterans Affairs ("CDVA") moved for and were allowed to intervene after the PI issued. Both intervenors oppose Plaintiffs' present motion. Yosemite argues that the specialty license plate it sponsored under § 5060's special license plate program, which was authorized by enabling statute § 5064, should not be enjoined because it constitutes government speech that "expresses the importance of the preservation and restoration of Yosemite National Park to the state of California." (Yosemite Opp'n at 26.) Yosemite also argues Plaintiffs lack standing, that the Tax Injunction Act precludes the relief Plaintiffs seek, and that Plaintiffs' claim constitutes a non-justiciable political question. CDVA argues the veterans' special license plate it sponsored under § 5060, which was authorized by enabling statute § 5068, should not be enjoined because it embodies government speech. CDVA also challenges Plaintiffs' standing.

## I. *Standing*

█ CDVA argues Plaintiffs have not suffered any injury for standing purposes. Moreover, Yosemite and CDVA argue any alleged injury suffered by Plaintiffs was not caused by Gourley and cannot be remedied by him. The Court is obligated to ensure that standing exists and to raise the issue sua sponte, if necessary. *San Francisco Drydock, Inc. v. Dalton*, 131 F.3d 776, 778 (9th Cir.1997).

"To establish standing a plaintiff must demonstrate: (1) the invasion of a legally-protected interest; (2) a causal connection between the injury and the defendant's conduct; and (3) a likelihood that the court can redress the injury by a favorable decision." *Oregon Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1094 (9th Cir. 1998) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "The standing requirement derives from Article III, Section 2 of the United States Constitution." *Johnson v. Weinberger*, 851 F.2d 233, 235 (9th Cir.1988). That provision requires a party to demonstrate he or she "has suffered injury-in-fact which 'fairly can be traced' to acts or omissions of the [sued] party." *Id.* Standing will not be found "[w]hen '[s]peculative inferences' are necessary ... to establish either injury or the

connection between the alleged injury and the act challenged...." *Id.*

■ Plaintiffs Dana Serrano and Kent Peters's response relies on conclusory arguments which do not demonstrate standing. The only allegation concerning each of these plaintiffs' standing follows:

> Both own a passenger car ... and would like to purchase a specialty license plate expressing their view that all life is valuable and should be cherished and respected, but are unable to purchase a specialty license plate which says 'Choose Life' or a similar message consistent with their view that would support adoption.

(Comp.¶ 3.) Although the plate they desire to purchase represents a cognizable interest, the injury necessary for standing "requires more than an injury to a cognizable interest." *Lujan,* 504 U.S. at 563, 112 S.Ct. 2130. Section 5060 does not provide the individual plaintiffs with a speech forum since it is only open to nonprofit organizations. These plaintiffs have therefore failed to show that rejection of WRN's application invaded their "legally-protected interest." *Oregon Natural Desert Ass'n,* 172 F.3d at 1094. Since their First Amendment challenges are based entirely on WRN's rejected application to speak, and they could not have made such an application themselves, they lack standing to bring this suit. *See Madsen v. Boise State University,* 976 F.2d 1219 (9th Cir. 1992); *see also Lakewood,* 486 U.S. at 755–56, 108 S.Ct. 2138 (indicating that "one who is subject to" a licensing statute may have standing to challenge the statute without first seeking a license). Therefore, plaintiffs Dana Serrano and Kent Peters are dismissed from this action.

WRN argues it has standing to stop the California Legislature "from engaging in content or viewpoint discrimination in a forum." (Plfs.' Reply at 1.) " 'In defining the relevant forum, the Court has focused on the access sought by the speaker.' " *Brown v. Calif. Dep't of Trans.,* 321 F.3d 1217, 1222 (9th Cir.2003) (citation omitted). WRN has only sought access to the § 5060 forum, located in article 8.4 of the California Vehicle Code. But a number of challenged statutes are located outside of that forum, in articles 8 and 8.5. WRN argues it has standing to challenge statutes located in articles 8 and 8.5, even though it did not seek access to those fora, because *Lakewood* provides: "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." 486 U.S. at 755–56, 108 S.Ct. 2138. But WRN has shown neither that the Legislature's enactment of these statutes was pursuant to the § 5060 special interest license program, nor that the speech authorized by these statutes concerns the subject matter of WRN's desired speech.

The challenged statutes in articles 8 and 8.5 are: §§ 5002.8 (Legislative or Congressional Member License Plate), 5005 (Amateur Radio Station License Plate), 5006 (Honorary Consular Officer License Plate), 5006.5 (Foreign Organizations License Plate), 5020–21 (Class D Radio Station License Plate), 5022 (1984 Olympic License Plate), 5023 (Commemorative Olympic License Plate), 5024 (Commemorative Collegiate License Plate), 5101.2 (Firefighter License Plate), 5101.3 (Pearl Harbor Survivor License Plate), 5101.4 (Legion of Valor License Plate), 5101.5 (Former Prisoner of War License Plate), 5101.6 (Congressional Medal of Honor Recipient License Plate), 5101.7 (1984 Olympic License Plate), 5101.8 (Purple Heart Recipient License Plate), and 5101.9 (Bill of Rights Bicentennial License Plate).

■ A forum analysis reveals these statutes are not subject to WRN's facial First Amendment challenge.

"[T]he Court [has] identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." Traditional public fora are defined by the objective characteristics of the property, such as whether, "by long tradition or by government fiat," the property has been "devoted to assembly and debate." The government can exclude a speaker from a traditional public forum "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest."

Designated public fora, in contrast, are created by purposeful governmental action. "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." Hence "the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny.

Other government properties are either nonpublic fora or not fora at all. The government can restrict access to a nonpublic forum "as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view."

In summary, traditional public fora are open for expressive activity regardless of the government's intent. The objective characteristics of these properties require the government to accommodate private speakers. The government is free to open additional properties for expressive use by the general public or by a particular class of speakers, thereby creating designated public fora. Where the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a nonpublic forum or not a forum at all.

[T]he government creates a designated public forum when it makes its property generally available to a certain class of speakers, .... [But it] does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, "obtain ·permission," to use it.

*Forbes,* 523 U.S. at 677–78, 118 S.Ct. 1633 (citations omitted). Defendants contend the speech at issue is located in a nonpublic forum. The statutes are not public fora because they "have not 'traditionally been available for public expression.'" *Brown,* 321 F.3d at 1222 (citation omitted). Nor do any of the statutes constitute a designated public forum, since there is no evidence that the government intended to open any of them "for public discourse." *Id.* The statutes are thus non-public fora.

Restrictions on access to a nonpublic forum are constitutional where they are: "(1) 'reasonable in light of the purpose served by the forum' and (2) 'viewpoint neutral....'" *Id.* (citations omitted.) "The reasonableness analysis focuses on whether the limitation is consistent with preserving the property for the purpose to which it is dedicated." *Id.* (citations and quotation marks omitted.) The viewpoint neutrality analysis focuses on whether there has been "content discrimination in

which 'the government targets not subject matter, but particular views taken by speakers on a subject.'" *Id.* at 1223 (citation omitted).

The challenged statutes in articles 8 and 8.5 concern special license plates that can be placed into various categories: status or prestige plates, plates commemorating the Olympic games, plates commemorating the Bicentennial of the Bill of Rights, or plates raising revenue for certain postsecondary college institutions. WRN has shown neither that the exclusion of its proposed speech from any of these fora was unreasonable in light of the purpose to which each is dedicated nor that the exclusion violated the viewpoint neutrality principle. Since none of the statutes express a viewpoint targeting the subject matter of WRN's proposed "Choose Life" message, there is no substance to WRN's suggestion that its exclusion was because of its "pro life" viewpoint. Therefore, this aspect of WRN's challenge is rejected.

■ Section 5060 provides that certain non-profit organizations may apply to the DMV for issuance of a specialized license plate if the Legislature first enacts an enabling statute to allow the plate's issuance. Nowhere in § 5060 is the Legislature's discretion circumscribed as to what speech is authorizable. This causes WRN an injury sufficient for standing because a facial First Amendment challenge lies whenever a licensing law "vests unbridled discretion in [an official or agency] over whether to permit or deny expressive activity...." *Lakewood,* 486 U.S. at 755, 108 S.Ct. 2138.

> Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.... In sum, without standards to fetter the licensor's discretion, the difficulties of proof and the case-by-case nature of "as-applied" challenges render the licensor's action in large measure effectively unreviewable.

> When these risks are sufficiently great, the remedy is to strike the licensing law in its entirety. The licensing law cannot be applied to anyone.

*The Tool Box,* 355 F.3d at 1241.

Yosemite contends the California Legislature is entitled to exercise "unbridled discretion" when deciding what speech is allowed in California's license plate program, relying on the principle discussed in *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). (Yosemite Opp'n at 38–40.) That principle states "judicial intervention [into legislative decisions] is generally unwarranted no matter how unwisely [the judiciary] may think a political branch has acted." *Id.* at 313–14, 113 S.Ct. 2096 (citation and quotation marks omitted). But the principle concerns a claim where " 'the pertinent question ... is whether [government] officials reasonably could have believed that the action was rationally related to a legitimate governmental interest.'" *Goulart v. Meadows,* 345 F.3d 239, 261 (4th Cir.2003) (emphasis and citation omitted). This principle does not apply to WRN's First Amendment challenge to § 5060 or the enabling statutes enacted under it. It is pellucid that a facial challenge to § 5060 is appropriate, since the First Amendment requires that California "establish neutral criteria to insure that the [plate] licensing decision is not based on the content or viewpoint of the speech

being considered." *Lakewood,* 486 U.S. at 760, 108 S.Ct. 2138. California's decision to use the legislative process, rather than a regulatory process, to determine whether a nonprofit organization can apply for a special interest license plate under § 5060 does not preclude standing for a facial challenge to the constitutionality of § 5060. "Clearly if the decision to authorize specialty plates [was] being made by a government official or commission under authority delegated by the legislature, the actions of the official or commission would be subject to judicial review. Leaving that authority directly in the hands of the [California] legislature [does] not change the analysis." *Henderson v. Stalder,* 287 F.3d 374, 389 (5th Cir.2002) (*"Henderson I"*) (W. Eugene Davis, J., dissenting).

The remaining standing issues are whether Gourley is causally connected to WRN's asserted First Amendment injury and whether WRN can seek to redress its injury through this suit. Since Gourley administers the enabling statutes enacted pursuant to the procedures prescribed in § 5060, and is responsible for issuance of specialty license plates authorized by the statutes, the causation and redressability requirements of standing are satisfied. *See American Booksellers Foundation v. Dean,* 342 F.3d 96 (2d Cir.2003) (enjoining enforcement of a statute by Attorney General because it was found unconstitutional). WRN has standing to bring a facial challenge to § 5060 and to seek to enjoin Gourley's administration of enabling statutes enacted under § 5060.

## II. *Tax Injunction Act*

Yosemite argues that the aspect of WRN's suit seeking to enjoin its enabling statute is barred by the Tax Injunction Act, prescribed in 28 U.S.C. § 1341. This Act prohibits federal courts from enjoining "the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such state." *Id.* It applies only if the challenged statute imposes a "tax" rather than a regulatory fee. "Distinguishing a tax from a fee often is a difficult task. Indeed, 'the line between a "tax" and a "fee" can be a blurry one.'" *Home Builders Ass'n v. City of Madison, Miss.,* 143 F.3d 1006, 1011 (5th Cir.1998) (citation omitted). "The classic tax is imposed by a state or municipal legislature, while the classic fee is imposed by an agency upon those it regulates." *Id.* "[T]hree primary factors in determining whether an assessment is a tax [are]: (1) the entity that imposes the assessment; (2) the parties upon whom the assessment is imposed; and (3) whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed." *Bidart Bros. v. California Apple Comm'n,* 73 F.3d 925, 931 (9th Cir.1996).

■ Yosemite argues the fees imposed on motorists for special license plates issued under § 5064 are "taxes" because "the proceeds go[ ] to a general fund and [are] spent for the benefit of the entire community." (Yosemite Opp'n at 22.) But the fees for the Yosemite plate are additional to the regular fees for a standard license plate and are imposed only on motorists who voluntarily request issuance of a Yosemite license plate. Section 5064 allocates the fees motorists expend for the plates into two funds which are separate from the general fund: one-half is placed in the "Yosemite Foundation Account" "for . . . the exclusive trust purposes of preservation and restoration projects in Yosemite National Park" and "one-half in the California Environmental License Plate Fund." § 5064(c)(1)-(2). The California Environmental License Plate Fund is prescribed in Public Resources Code § 21191,

and the Legislature declares in Public Resources Code § 21190 that money deposited in the Fund is to be used for environmental purposes.

Special fees collected from motorists electing to benefit the Yosemite National Park and/or California environmental causes do not constitute a tax. The fees are voluntarily paid by a limited group of motorists who wish to both support a federal national park and/or California environmental causes, and presumably desire to display that support on their license plates. *See Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 6 (1st Cir. 1992) (finding "the fact[s] that the fees paid [we]re held separately from general state funds" and were "collected only from those seeking the privilege of driving on state highways" supported a conclusion that the fees were not a "tax"). Plainly, the Tax Injunction Act does not apply.[3]

III. *Permanent Injunction*

A. *Section 5060*

Before WRN can prevail on its motion to permanently enjoin California's use of § 5060, it must establish "[t]he requirements for the issuance of a permanent injunction[, which] are the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1495 (9th Cir. 1996) (citations and quotation marks omitted). Requests for injunctive relief must

be scrutinized closely "to make sure that the remedy protects the plaintiffs' constitutional and statutory rights, but does not require more of state officials than is necessary to assure their compliance with . . . law." *Id.* at 1496. The "substantial and immediate irreparable injury" requirement "cannot be met [if] there is no showing of any real or immediate threat that the plaintiff will be wronged again." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Thus, to obtain injunctive relief, WRN must make "[a] reasonable showing of a sufficient likelihood that [it] will be injured again. . . ." *Kruse v. State of Hawai'i* 68 F.3d 331, 335 (9th Cir.1995).

■ Section 5060 grants California legislators unconstitutional, unfettered discretion to deny a private nonprofit organization's request for an enabling statute authorizing issuance of a plate. *See American Civ. Lib. Union, NV v. City of Las Vegas*, 333 F.3d 1092, 1107 (9th Cir. 2003). This aspect of the forum is facially unconstitutional under the First Amendment because no standard governs the decision who may speak. The First Amendment does not allow the government to use a standardless forum to select private speakers because the government may use such a forum to present views it finds acceptable while denying access to those " 'wishing to express less favored or more controversial views.' " *Henderson I*, 287 F.3d at 387 (W. Eugene Davis, J., dissenting) (citation omitted).[4] Therefore, the

---

**3.** Yosemite Foundation also argues WRN's challenge to § 5064 concerns a non-justiciable political question. (Yosemite Opp'n 15–21.) Decision on this argument requires determination of the nature of the speech at issue. Since that determination will make it unnecessary to "reach the question of the impact of the political question doctrine on this [challenge]," the argument is rejected as moot. *United States v. Bozarov*, 974 F.2d 1037, 1045 n. 9 (9th Cir.1992).

**4.** Since viewpoint discrimination is unconstitutional in any forum, a forum analysis of § 5060 is unnecessary. *See Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829–830, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (holding viewpoint discrimination is unconstitutional in a designated public forum); *Forbes*, 523 U.S. at 677–78, 118 S.Ct. 1633 (holding viewpoint discrimination is unconstitutional in a nonpublic forum).

Director of the California Department of Motor Vehicles is permanently enjoined from approving any new special interest license plate under the scheme now prescribed in § 5060 for private non-profit organizations.[5]

### B. *Enabling Statutes Enacted Under § 5060*

WRN also seeks to permanently enjoin all enabling statutes argued to have been enacted under § 5060's special interest license plate program. Since § 5060 is located in Article 8.4, WRN argues that *"any* plate enacted according to Article 8.4" must be enjoined.[6] (Pls.' Mot. at 17). The following special interest plates are within the scope of this argument: §§ 5062 (Blue Sky License Plate), 5064 (Yosemite Foundation License Plate), 5066 (California Memorial License Plate), 5067 (California Coastal Commission License Plate), 5068 (Veterans License Plate), 5070 (Breast Cancer Treatment License Plate), 5071 (AIDS Research License Plate), 5071.1 (Girl Scouts of America License Plate), 5072 (Have a Heart, Be a Star, Help Our Kids License Plate), 5073 (Ronald Reagan Presidential Library License Plate), 5074 (License Plate for the Arts),

5075 (Lake Tahoe Conservancy License Plate), and 5080 (Rotary International License Plate).

Six of these statutes have been repealed. Specifically, California Senate Bill 315 indicates the following five enabling statutes are repealed: §§ 5070 (Breast Cancer Treatment License Plate), 5071 (Aids Research License Plate), 5071.1 (Girl Scouts of America License Plate), 5073 (Ronald Reagan Presidential Library License Plate), and 5080 (Rotary International License Plate). *See* 2003 Cal. Legis. Serv. Ch. 594 (S.B.315) (West). The "Rosenthal Blue Sky License Plate Program," enabled by § 5062 was repealed by its own terms as of January 1, 1997. § 5062(j). WRN's motion is therefore moot as to these statutes. *See Foster v. Carson,* 347 F.3d 742, 745 (9th Cir.2003) (stating where there is no longer a possibility of obtaining relief for a claim, " 'that claim is moot and must be dismissed for lack of jurisdiction' "). Since this aspect of WRN's motion is moot, its challenge to these statutes is rejected.

Decision on the remainder of WRN's challenge to enabling statutes in article 8.4 involves determination whether the speech is private and/or government speech.

5. WRN also seeks declaratory relief. But a federal court need not issue declaratory relief "[w]here a party [has obtained] . . . a substantially similar alternative remedy such as an injunction." *Kinghorn v. Citibank, N.A.,* 1999 WL 30534, at *7 (N.D.Cal. Jan. 20, 1999); *see also Allis–Chalmers Corp. v. Arnold,* 619 F.2d 44, 46 (9th Cir.1980) (finding judge may refuse declaratory relief "[w]here more effective relief can be obtained by other proceedings"); *Smith v. Metro. Property & Liability Inc. Co.,* 629 F.2d 757, 759 (2d Cir.1980) (finding judges have discretion to deny declaratory relief where an alternative remedy is better or more effective); *Cartier v. Sec. of State,* 506 F.2d 191, 200 (D.C.Cir.1974) (same). WRN's request for declaratory relief is denied in light of the permanent injunction ruling.

6. WRN also argues any statute "referencing § 5060" is unconstitutional, and that the Fire-

fighter's statute located in article 8.5 and codified in § 5101.2 is such a statute, and must be enjoined. (Pls.' Mot. at 5 and 17.) The Firefighter's statute has not been shown to have been enacted under § 5060's special interest license plate program. The text of § 5101.2 states "[a]ny *license plates issued pursuant to this section* shall be issued in accordance with Section 5060." § 5101.2(a) (Emphasis added). This reference to § 5060 concerning *issuance* of license plates does not state this statute was *enacted* by the Legislature under the § 5060 special license plate program. *See* Section I, *infra* (where the Firefighter's statute is held to be speech in a nonpublic forum which does not target the subject matter of WRN's "Choose Life" message).

It is well established that "the government can speak for itself...." The government may promote its policies and positions either through its own officials or through its agents. This authority to "speak" necessarily carries with it the authority to select from various viewpoints those that the government will express as its own.

*SCV I*, 288 F.3d at 616–17. The Supreme Court held in *Rust v. Sullivan*, 500 U.S. 173, 198–200, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), that the government's authority to speak includes funding chosen activities.

> [*Rust*] recognized "that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes".... "In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other" .... *Rust's* holding has been limited to situations in which "the government is itself the speaker, or instances ... in which the government used private speakers to transmit [its own message]."

*Brown*, 321 F.3d at 1224 (citations omitted). *Rust* "addresses ... the government's ability to exclude from a government-funded program speech that is incompatible with the program's objectives." *Id.*

■■ WRN contends "the key question is whether [these] specialty plates are government speech or [private speech located in] a government-sponsored forum for private speech." (Pls.' Mot. at 16.) But the speech may represent both private and government speech where both the government and a private motorist communicate via the speech. *Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dept. of Motor Vehicles*, 305 F.3d 241, 245 (4th Cir.2002) ("*SCV II*") (Luttig, J., respecting the denial of rehearing *en banc*). While the

Supreme Court stated in *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), that the government's promotion of a state motto on a license plate mounted on a private vehicle implicated private speech interests because it required private parties to "use their private property as a 'mobile billboard' for the State's ideological message, ..." it is evident that this speech was also considered to be government speech. *Id.* at 716, 97 S.Ct. 1428. Further, the location of the enabling statute authorizing the speech does not necessarily dictate that the speech is fundamentally government or private speech. *See SCV I*, 288 F.3d at 618 (stating that factors involved when deciding the nature of the speech include the "central purpose" of speech, the party exercising "editorial control," the "literal speaker," and the party bearing "ultimate responsibility" for the speech); *Wells v. City and County of Denver*, 257 F.3d 1132, 1141 (10th Cir.), *cert. denied*, 534 U.S. 997, 122 S.Ct. 469, 151 L.Ed.2d 384 (2001) (same).

WRN also makes the conclusory argument that "three courts have found unequivocally that specialty license plates and the statutory schemes creating them constitute private speech, not government speech," citing *SCV I, Henderson v. Stalder*, 265 F.Supp.2d 699 (E.D.La.2003) ("*Henderson II*"), and *Planned Parenthood v. Rose*, 236 F.Supp.2d 564, 570–71 (D.S.C.2002). (Pls.' Mot. at 16.) Since *Henderson II* and *Rose* rely on the analysis in *SCV I*, that analysis is considered. A key factor in the *SCV I* analysis is "the net financial impact of the [special plate] program on the [State of Virginia's] fisc," which was found to be unlike "the kind of selective *funding* decisions involved in cases like *Rust* and [*Nat'l Endowment for the Arts v.*]*Finley*[, 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998)]." *SCV I*,

288 F.3d at 619 (emphasis in original). Here, the language of each enabling statute evidences that the revenue generated by each plate is earmarked for distribution to specified government funds and programs. These provisions are similar to the selective funding decisions that the United States Supreme Court approved in *Rust* and *Finley*. Thus the nature of the speech authorized in each challenged enabling statute must be determined.

The Yosemite statute, embodied in § 5064, directs the DMV to consult with a private organization, the Yosemite Foundation, to design a license plate "depicting a significant feature or quality of Yosemite National Park." § 5064(a). One half of the revenue generated through the license plate is designated for placement in the Yosemite Foundation Account for "the exclusive trust purposes of preservation and restoration projects in Yosemite National Park."[7] § 5064(c)(1). The projects to which these funds are to be applied have been chosen pursuant to a cooperative agreement between the Yosemite Founda-tion and Yosemite National Park and identified by the Superintendent of Yosemite National Park. (Yosemite's Undisputed Facts ¶¶ 4–5; Pls.' Response to Yosemite's Undisputed Facts at 1.) *See* 16 U.S.C. § 1a–2(g). The other half of the revenue is placed in the California Environmental License Plate Fund, to supplement other state environmental projects. *See* § 5064(c)(2) and History and Statutory Notes; Cal. Pub. Res.Code §§ 21190–91. Although the Yosemite Foundation initially proposed the license plate, this legislation makes it apparent that California has adopted the plate's message and purpose as its own. This adoption is also evidenced by the statutory requirement obligating the Yosemite Foundation to "report to the Legislature on or before June 30 of each year on its use and expenditure of the money in the Yosemite Foundation Account." § 5064(d). In the Historical and Statutory Notes, the Legislature indicated its understanding of the public purpose for which funds in the Yosemite Foundation Account would be expended:

---

7. The discussion of revenue, with respect to all the statutes addressed in this section except § 5066, omits the DMV's deduction of its administrative costs from the revenue generated by the special license plates. The discussion with respect to some of these statutes also omits mention of deposits into the California Environmental License Plate Fund. California Public Resources Code § 21191 provides that the "California Environmental License Plate Fund ... consists of the moneys deposited in the fund pursuant to any provision of law." The purposes of the Fund are specified in Public Resources Code § 21190, which states in pertinent part:

There is in this state the California Environmental Protection Program, which shall be concerned with the preservation and protection of California's environment. In this connection, the Legislature hereby finds and declares that, since the inception of the program ..., the Department of Motor Vehicles has, in the course of issuing environmental license plates, consistently informed potential purchasers of those plates, by means of a detailed brochure, of the manner in which the program functions, the particular purposes for which revenues from the issuance of those plates can lawfully be expended, and examples of particular projects and programs that have been financed by those revenues. Therefore, because of this representation by the Department of Motor Vehicles, purchasers come to expect and rely that the moneys paid by them will be expended only for those particular purposes, which results in an obligation on the part of the state to expend the revenues only for those particular purposes. Accordingly, all funds expended pursuant to this division shall be used only to support identifiable projects and programs of state agencies, cities, ... counties, districts, the University of California, private nonprofit environmental and land acquisition organizations, and private research organizations which have a clearly defined benefit to the people of the State of California and which have one or more of the [listed purposes in the section].

(a) The Legislature finds and declares as follows:

(1) The Yosemite Foundation, also known as the Yosemite Fund, is a tax exempt, nonprofit organization created for the benefit of Yosemite National Park, which has provided funds for numerous projects within the park, including, but not limited to, the restoration of Stoneman Meadow in Yosemite Valley, the reintroduction of bighorn sheep to the park, replanting of numerous black oak trees in Yosemite Valley, maintenance of back country trails, and the restoration of the Happy Isles area which now provides access to the park for the disabled and handicapped. The Yosemite Foundation, which has in excess of 30,000 contributors, does not raise or spend money for the operation of Yosemite National Park but, instead, for the preservation and restoration needs of the park.

Section 1 of Stats., 1992, c. 1273 (AB 2700). This statute reflects the primary purposes of preserving and restoring Yosemite National Park, and protecting California's environment.

The California memorial statute, prescribed in § 5066, requires the DMV "in conjunction with the California Highway Patrol, [to] design and make available for issuance ... the California memorial license plate." § 5066(a). Section 5066 provides in pertinent part:

(c) The [DMV] shall deposit the additional revenue derived from the issuance, renewal, transfer, and substitution of California memorial license plates as follows:

(1) Eighty-five percent in the Antiterrorism Fund, which is hereby created in the General Fund.

(A) Upon appropriation by the Legislature, one-half of the money in the fund shall be allocated by the Controller to the Office of Criminal Justice Planning to be used solely for antiterrorism activities. The office may not use more than 5 percent of the funds appropriated to it for administrative purposes.

(B) Upon appropriation by the Legislature in the annual Budget Act or in another statute, one-half of the money in the fund shall be used solely for antiterrorism activities.

(2) Fifteen percent in the California Memorial Scholarship Fund, which is hereby established in the General Fund. Moneys deposited in this fund shall be administered by the Scholarshare Investment Board, and shall be available, upon appropriation in the annual Budget Act or in another statute, for distribution or encumbrance by the board pursuant to Article 21. 5 (commencing with Section 70010) of Chapter 2 of Part 42 of the Education Code.

(d) The department shall deduct its costs to administer, but not to develop, the California memorial license plate program. The department may utilize an amount of money, not to exceed fifty thousand dollars ($50,000) annually, derived from the issuance, renewal, transfer, and substitution of California memorial license plates for the continued promotion of the California memorial license plate program of this section.

(e) "Antiterrorism activities" means activities related to the prevention, detection, and emergency response to terrorism that are undertaken by state and local law enforcement, fire protection, and public health agencies. The funds provided for these activities, to the extent that funds are available, shall be used exclusively for purposes directly related to fighting terrorism. Eligible activities include, but are not limited to, hiring support staff to perform administrative tasks, hiring and training addi-

tional law enforcement, fire protection, and public health personnel, response training for existing and additional law enforcement, fire protection, and public health personnel, and hazardous materials and other equipment expenditures. (f) Beginning January 1, 2007, and each January 1 thereafter, the department shall determine the number of currently outstanding and valid California memorial license plates. If that number is less than 7,500 in any year, then the department shall no longer issue or replace those plates.

This statutory language reflects the primary purpose of supporting and enhancing California's ability to combat terrorist activities.

The California Coastal Commission statute, prescribed in § 5067, requires the DMV, in consultation with the California Coastal Commission ("CCC") to design and make available for issuance "special environmental design license plates ... bear[ing] a graphic design depicting a California coastal motif." § 5067(a). One half of the revenue generated by this statute is distributed to the California Beach and Coastal Enhancement Account for allocation to CCC

for expenditure for the Adopt–A–Beach program, the Beach Cleanup Day program, coastal public education programs, and grants to local governments and nonprofit organizations for the costs of operating and maintaining public beaches related to these programs. Any funds remaining in the California Beach and Coastal Enhancement Account at the end of a fiscal year shall be allocated by the Controller, after appropriation by the Legislature, to the State Coastal Conservancy for coastal natural resource restoration and enhancement projects and for other projects consistent with the provisions of Division 21

(commencing with Section 31000) of the Public Resources Code.

§ 5067(c)(1). The other half of the revenue is distributed to the "California Environmental License Plate Fund." § 5066(c)(2). The design of the license plate and the distribution of the revenue reflect the primary purposes of protecting and enhancing California's coastline, and protecting California's environment.

The veterans statute, prescribed in § 5068, provides that "any veterans' organization may apply either individually or with other veterans' organizations to meet the minimum 5,000 application threshold set forth in Section 5060 for special license plates." § 5068(a)(1). It is prescribed in § 5069 that "revenue derived from the additional special fees provided in Section 5068, less costs incurred by the [DMV] ... shall be deposited in the Veterans Service Office Fund, created by Section 972.2 of the Military and Veterans Code.... The revenue derived from the additional special fee ... less costs incurred by the department pursuant to this article, shall be deposited as follows: (1) One-half in the Veterans Service Office Fund. (2) One-half in the California Environmental License Plate Fund." §§ 5069(a), (b)(1), (b)(2). Section 972.2 provides in pertinent part:

[T]he Veterans Service Office Fund shall be available, upon appropriation by the Legislature, to the Department of Veterans Affairs for allocation and disbursement to counties for the operation of county veterans service offices.

.    .    .    .    .

It is the intent of the Legislature, in enacting this section, that revenues from the special interest license plate ... and deposited in the Veterans Service Office Fund, shall be used to expand the support of county veterans service offices.

Although § 5068 allows private parties to purchase license plates which refer to individual veterans organizations, the statutory language reflects the primary purposes of honoring veterans and funding government veterans agencies.

The child health and safety statute, prescribed in § 5072, requires the DMV to cooperate with the California Highway Patrol and the Prison Industries Authority in designing a license plate combining the phrase "Have a Heart, Be a Star, Help Our Kids" with a design including "[a] heart shape, a five pointed star, a hand shape, [and] a plus-sign shape." § 5072(a). Revenue derived from sale of this plate is to "be deposited in the Child Health and Safety Fund ... and, when appropriated by the Legislature ... be available for the purposes" prescribed in California Welfare and Institutions Code 18285. Welfare and Institutions Code § 18285 provides in pertinent part:

> (e) Fifty percent of moneys derived from the license plate program pursuant to Section 5072 of the Vehicle Code shall be available, upon appropriation, for programs which address any of the following child health and safety concerns and that are either to be carried out within a two-year period or whose implementation is dependent upon one-time initial funding:

> (1) Child abuse prevention, except that not more than 25 percent of the moneys in this fund shall be used for this purpose. Ninety percent of the 25 percent shall be deposited in the county children's trust fund, established pursuant to Section 18966 of the Welfare and Institutions Code, for the support of child abuse prevention services in the community, and 10 percent of the 25 percent shall be deposited in the State Children's Trust Fund, established pursuant to Section 18969, for public education, training, and technical assistance.

> (2) Vehicular safety, including restraint warnings and education programs.

> (3) Drowning prevention.

> (4) Playground safety standards.

> (5) Bicycle safety.

> (6) Gun safety.

> (7) Fire safety.

> (8) Poison control and safety.

> (9) In-home safety.

> (10) Childhood lead poisoning.

> (11) Sudden infant death syndrome.

The design of the license plate and the distribution of the revenue reflects the primary purpose of endorsing and funding activities to protect the health and safety of children.

The "License Plates for the Arts Act of 1993," prescribed in § 5074, requires the DMV to consult with the California Arts Council ("CAC") to create a license plate with "a full-plate graphic design, depicting a significant feature or quality of the State of California." § 5074(a)-(b). Revenue collected for certain "additional fees" will be "deposited in the Environmental License Plate Fund," see § 5074(b)(4), and the remainder of the revenue will be deposited in the Graphic Design License Plate Account and used by CAC, "upon appropriation by the Legislature, for arts education and local arts programming." § 5074(c). The license plate's design and distribution of revenue reflects a primary purpose of supporting and funding California's art programs.

The Lake Tahoe statute, prescribed in § 5075, requires the DMV to consult with the Lake Tahoe Conservancy in designing a "special environmental design license plate[ ] ... bear[ing] a full-plate graphic design depicting a significant feature of Lake Tahoe." § 5075(a). The revenue from certain "additional fees" is designated

for deposit in the Environmental License Plate Fund, *see* § 5075(b)(5), with the remaining revenue deposited in the Lake Tahoe Conservancy Account for allocation toward "the exclusive trust purposes of preservation and restoration projects in the Lake Tahoe area and for the purpose of establishing and improving trails, pathways, and public access for nonmotorized traffic in that area." § 5075(c). The design of the plate and designated use of revenue reflects a primary purpose of supporting and funding actions to protect the environment in the Lake Tahoe area and make that area usable for public recreation.

It is pellucid that the speech on the license plates authorized by these statutes "is neither exclusively that of the private individuals nor exclusively that of the government, but, rather, hybrid speech of both." *SCV II*, 305 F.3d at 245. The governmental component of the speech evidences that the speech is fundamentally government speech which promotes California's policies. WRN has not shown it has a "First Amendment right to dictate or to contribute to the content of [this government] speech." *Downs*, 228 F.3d at 1009; *Wells*, 257 F.3d at 1139. Nor has WRN shown that the existence of this government speech causes or is likely to cause it "substantial and immediate irreparable injury." *Easyriders*, 92 F.3d at 1495. Therefore, WRN's motion challenging this speech is rejected.

### CONCLUSION

For the reasons set forth above, the Director of the California Department of Motor Vehicles is permanently enjoined from issuing any new special interest license plate under the program now prescribed in § 5060 for private non-profit organizations. The balance of WRN's challenge is rejected. Judgment is entered in accordance with this Order.

IT IS SO ORDERED.