**The CHILDREN FIRST FOUNDATION, INC., a New York non-profit organization, Plaintiff,**

**v.**

**Raymond P. MARTINEZ, individually; David J. Swartz, in his official capacity as Commissioner of the New York Department of Motor Vehicle; Jill A. Dunn, individually and in her official capacity as Deputy Commissioner for the New York Department of Motor**

Vehicles; and George E. Pataki, individually, Eliot Spitzer, individually and in his official capacity as Governor of the State of New York; Andrew Cuomo, in his official capacity as Attorney General, Defendants.[1]

Civ. No. 1:04–CV–0927 (NPM/RFT).

United States District Court,
N.D. New York.

Aug. 3, 2007.

---

1. Pursuant to FED. R. CIV. P. 25(d)(1), we note the change in the roster of Defendants and the capacity for which they are currently being sued. David J. Swartz is currently the Commissioner of the New York State Department of Motor Vehicles and he is being substituted for the former Commissioner Nancy A. Naples. Upon information and belief, Jill A. Dunn is longer the Deputy Commissioner and Counsel for the New York State Department of Motor Vehicle, but a new Deputy Commissioner and Counsel has not been identified. Once that new Deputy Commissioner and Counsel is appointed, he or she will be substituted for Dunn as Dunn can no longer be sued in her official capacity. *See infra* notes 6 & 8. Eliot Spitzer is now the Governor of New York succeeding George E. Pataki. Said succession is also being noted above. Lastly, Andrew M. Cuomo succeeds Eliot Spitzer as New York's Attorney General and will be substituted in that official capacity.

Gucciardo, Raum Law Firm, Brian W. Raum, of Counsel, New York, NY, for Children First Foundation, Inc.

Alliance Defense Fund, James M. Johnson, of Counsel, Shreveport, LA, for Children First Foundation, Inc.

Alliance Defense Fund—DC Office, Jeffrey A. Shafer, of Counsel, Washington, D.C., for Children First Foundation, Inc.

Hiscock & Barclay, LLP, Linda J. Clark, Michael J. Grygiel, of Counsel, Albany, NY, for Jill A. Dunn, individual capacity.

Houguet, Newman Law Firm, Ira J. Lipton, Elizabeth A. Musella, of Counsel, New York, NY, for George Pataki, individual capacity.

Harris Beach PLLC, Mark J. McCarthy, of Counsel, Albany, NY, for Raymond Martinez, individual capacity.

Hon. Andrew M. Cuomo, Attorney General, Krista A. Rock, David M. Finkelstein, Michael G. McCartin, of Counsel, Albany, NY, for Jill A. Dunn, Eliot Spitzer, Andrew M. Cuomo, and Nancy A. Naples, in their official capacities.

## MEMORANDUM–DECISION AND ORDER ON MOTION TO AMEND

RANDOLPH F. TREECE, United States Magistrate Judge.

Presently before this Court is Defendant Dunn's Motion to Amend her Answer. Dkt. No. 67, Dunn's Mot. to Amend, dated Mar. 22, 2007.[2] Although there are other parties to this action, only Plaintiff Children First Foundation, Inc. (hereinafter "CFF") opposes Dunn's Motion to Amend. Dkt. No. 78, Pl.'s Mem. of Law in Opp'n to Mot. to Amend, dated Mar. 29, 2007, with Exs. A–C.[3] Based upon reasons to follow, the Dunn's Motion to Amend is **granted in part and denied in part.**

## I. BACKGROUND

Generally the Court would presume that all are familiar with the facts of the litigation. However, due to the complexity of the issues, we will state the more salient facts and events so that the issues are properly framed.

### A. CFF's Complaint[4]

Pursuant to New York's Vehicle and Traffic Law, § 401 *et seq.*, the Commissioner of the Department of Motor Vehicles (hereinafter "DMV") was granted authority to establish three distinct categories of custom license plates: "Historical and Vintage Plates," "Special Number Plates," and "Picture Plates." Dk. No. 49, First Am. Compl. at ¶¶ 10–13. Basically, Picture Plates are commonly known as logo plates which permit a picture or logo in addition to an identification plate number. *Id.* at ¶ 16. As a part of the Picture Plate program, there are several sub-categories, which include, inter alia, "Organization and Causes." *Id.* at ¶ 17.[5] A significant feature of this program permits Picture Plates to be used to raise funds for non-profit agencies. Although many of these "Organization and Causes" Picture Plates have already been approved by the State Legislature, the majority are approved by DMV. *Id.* at ¶ 21–27; *see supra* note 4.

Children First Foundations and alike organizations are ubiquitous throughout this nation. Dr. Elizabeth Rex formed CFF, a New York not-for-profit corporation, for the tri-states of Connecticut, New Jersey, and New York, with the promulgated purpose "to promote and support adoption as a positive choice for women with unwanted pregnancies or new borns" and with the mission of "increas[ing] . . . adoptions by raising public awareness, support and funds for the needs of women who choose

---

**2.** Dunn's Motion to Amend her Answer is comprised of Attorney Declarations from Linda J. Clark and Jill A. Dunn, both dated March 22, 2007, Exhibits A–C, and a Memorandum of Law. *See* Dkt. No. 67.

**3.** The State Defendants submitted a Letter–Brief stating that they do not take a position with respect to Dunn's Motion seeking leave to file an Amended Answer to the First Amended Complaint. See Dkt. No. 72, State Defs.' Lt.-Br., dated Mar. 26, 2007. Because Defendant Pataki did not file a similar Letter–Brief and by his acquiescence, we presume that he has taken a similar "no position" stance on Dunn's Motion.

**4.** For the most part, the facts for this section are accepted from CFF's First Amended Complaint. Dkt. No. 49.

**5.** Currently, DMV offers approximately fifty-nine (59) types of Picture Plates under the category Organization and Causes. First Am. Compl. at ¶ 20; *see* http://www.nydmv.state. ny.us/org.htm. Many of these Picture Plates have been authorized by the State Legislature. First Am. Compl. at ¶ 21; *see* N.Y. VEH. & TRAF. LAW §§ 404–b through 404–u.

life ...." *See* http://www.thechildrenfirst. org/mission.htm. CFF does not dispute that its underlying message is one of pro-life inasmuch as Choose Life, Inc., an organization committed to the promotion of alternatives to abortion, has permitted CFF to use "Choose Life" as a part its mission statement. First Am. Compl. at ¶ 33. As has been done in Connecticut and New Jersey, CFF has attempted to secure a Picture Plate from New York since 2001, in order to increase the organization's identity, raise funds, increase membership, and promotes its causes. *Id.* at ¶¶ 37–91. CFF's prominent tag line for the Picture Plate would state "Choose Life," which has remained its constant theme throughout other modifications to the proposed plate. *Id.* at ¶¶ 33 & 50–55. CFF's application for this Plate was rejected repeatedly by the Commissioner of DMV, modifications notwithstanding. *Id.* at ¶¶ 50–70, Exs. to Am. Compl.

On August 4, 2004, CFF filed a 42 U.S.C. § 1983 civil rights action against Raymond Martinez, then Commissioner of DMV, Jill A. Dunn, then Deputy Commissioner and Counsel for DMV, Elliot Spitzer, then Attorney General, and George E. Pataki, then Governor, in both their official and individual capacities, alleging that Defendants violated CFF's rights to Freedom of Speech, Due Process, and Equal Protection of the Law. Dkt. Nos. 1, Compl., & 49, First Am. Compl.[6] The crux of CFF's Complaint is that the rejections of their proposed Picture Plate with the tag line of "Choose Life" is content-based and view-point discrimination. First Am. Compl. at ¶ 109.

CFF's action was met immediately by Defendants' Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(6). Dkt. No. 7, Defs.' Mot. to Dismiss, dated Nov. 15, 2004. At that juncture of the litigation, New York State's Attorney General was representing all of the named Defendants in both their official and individual capacities. Oral arguments were held before the Honorable Neal P. McCurn, Senior United States District Judge, on January 4, 2005, in which a myriad of First Amendment issues were discussed. Among those many issues, which included a failure to state a cause of action, the bar under the Eleventh Amendment of the United States Constitution, lack of personal involvement by Defendants, and the doctrine of qualified immunity, was whether Defendants' actions, particularly Martinez's, were reasonable and viewpoint neutral as DMV attempted not to endorse a position on abortion, now the fulcrum of the current Motion to Amend. Dkt. Nos. 7, Defs.' Mem. of Law, & 17, Oral Argument, Jan. 4, 2005 (hereinafter "Hr'g Tr."). After listening to a thorough discussion on the Motion to Dismiss, Judge McCurn ruled that CFF has sufficiently alleged violations of the First and Fourteenth Amendments to the United States Constitution, though claims for money damages against Defendants in their official capacities were dismissed. Dkt. Nos. 16, Min. Entry, dated Jan. 5, 2005, 17, Hr'g Tr. at pp. 70–73. Additionally, qualified immunity was a

6. Initially, along with its right to free speech cause of action, CFF pled a constitutional cause of action of right of assembly. Compl. at ¶¶ 93–115. However, during oral arguments on Defendants' Motion to Dismiss, held on January 4, 2005, CFF withdrew this cause of action, Dkt. No. 17, Transcript ("Tr.") at p. 71, thus absent from the First Amended Complaint, which was filed, without objection, on September 8, 2006, Dkt. No. 49. Furthermore, in addition to alleging First and Fourteenth Amendments violations, CFF alleges a violation of Article 1, ¶ 8 of the New York Constitution. First Am. Compl., at Prayer for Relief, ¶ A.

In terms of the parties remaining capacities within this lawsuit. *see supra* note 1 and *infra* note 8.

keen focus during the oral arguments. In terms of Defendants' qualified immunity defense, Judge McCurn decided not to treat or consider the qualified immunity defense under a Rule 12(b)(6) motion to dismiss analysis and suggested that this affirmative defense could be asserted within an answer and raised later during a motion for summary judgment. *Id.* at p. 76.

Shortly thereafter, State Defendants filed a Motion for Reconsideration of the January 4, 2005 Ruling and Order, pursuant to FED. R. CIV. P. 54(b), primarily raising the matter of qualified immunity again by arguing that such defense should be addressed within a motion to dismiss context. Dkt. No. 18, Defs.' Mot. to Recons. Relying upon *McKenna v. Wright*, 386 F.3d 432 (2d Cir.2004), where the Second Circuit held that it lacked appellate jurisdiction because it could not determine the availability of qualified immunity as a matter of law during a motion to dismiss review, Judge McCurn found that "[D]efendants have not established that the facts on the face of the [C]omplaint support a qualified immunity defense." Dkt. No. 31, Mem.-Decision & Order, dated Feb. 18, 2005, at p. 5 (citations omitted). Defendants immediately filed a Notice of Appeal as to both the January 5 and February 18, 2005 Orders. Dkt. Nos. 23 & 32. In the interim, Defendants filed their Answer. Dkt. No. 21.[7]

On March 6, 2006, the Second Circuit issued a Summary Order dismissing Defendants' appeal. Dkt. No. 35, Second Circuit Mandate; *Children First Foundation, Inc., et. al. v. Martinez, et. al.*, 169 Fed. Appx. 637 (2d Cir.2006). First, the Circuit pointed out that New York's picture plate program is a nonpublic forum

and "even in a nonpublic forum, restrictions on speech must be reasonable and viewpoint neutral." 169 Fed. Appx. at 639 (citing *Perry v. McDonald*, 280 F.3d 159, 169 (2d Cir.2001)). Accepting all allegations and reasonable inferences in favor of Plaintiffs, the Second Circuit found that CFF had sufficiently pled a claim of viewpoint discrimination by alleging that Defendants "denied the [P]icture [P]late [A]pplication based on their disagreement with [the] life-affirming viewpoint expressed by the plate." *Id.* Second, noting that the defense of qualified immunity cannot "usually" be sustained upon a Rule 12(b)(6) motion, the Circuit Court wrote that "[b]ecause the facts supporting the defense of qualified immunity do not appear on the face of the complaint, we lack appellate jurisdiction." *Id.* (citing. *inter alia, McKenna v. Wright*, 386 F.3d at 435). Yet a critical critique, possibly the lynchpin to our analysis of Dunn's Motion to Amend, resulted when the Second Circuit succinctly addressed Defendants' invocation of the government speech doctrine:

> Defendants also argue that it would have been reasonable for them to believe their actions were permissible under the government speech doctrine. Although the government may discriminate on the basis of viewpoint when it is speaking only for itself, *see Legal Services Corp. v. Velazquez*, 531 U.S. 533, 541–42, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001); *Bd. of Regents v. Southworth*, 529 U.S. 217, 229, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000); *Rosenberger v. Rector & Visitors*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Rust v. Sullivan*, 500 U.S. 173, 196–97, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), custom license plates involve, at minimum, some

---

7. This Answer was amended on October 11, 2006, Dkt. No. 51, in response to CFF's

Amended Complaint, Dkt. No. 49.

private speech, *see Wooley v. Maynard*, 430 U.S. 705, 715, 717, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (holding that New Hampshire's requirement that motorists display the message "Live Free or Die" on their license plates violated motorists' First Amendment rights); *Perry*, 280 F.3d at 166–67 (describing personalized plates as private speech on government property). Therefore, it would not have been reasonable for defendants to conclude this doctrine permitted viewpoint discrimination in this case.

*Id.* at 639 (quotations marks in original).

### B. Defendants' Representation and Dunn's Motion to Amend

From this lawsuit's inception until approximately January 31, 2007, Defendants have had only one attorney, the Attorney General. However, on January 31, 2007, the law firm of Houguet Newman & Regal, LLP, Ira J. Lipton, Esq., of counsel, filed a Notice of Appearance on behalf of George E. Pataki in his individual capacity. Dkt. No. 59. A month later, the law firm of Hiscock & Barclay, Linda J. Clark, Esq., of counsel, filed a Notice of Appearance on behalf of Jill A. Dunn, in her individual capacity. Dkt. No. 61. And most recently, the law firm of Harris Beach PLLC, Mark J. McCarthy, Esq., of counsel, filed a Notice of Appearance on behalf of Raymond P. Martinez. Dkt. No. 106. Lastly, the Attorney General represents Defendants Dunn, David J. Swartz, the new Commissioner of DMV, Eliot Spit-

zer, now Governor, and Andrew M. Cuomo, now Attorney General, in their official capacities. *See* Dkt. No. 87, Not. of Appearance.

At the time when the Attorney General represented all of the Defendants in all of their various capacities, in addition to entering denials to CFF's Amended Complaint, Defendants plead all of the same defenses, including qualified immunity, which were the bases of their Motion to Dismiss. Defendants have also added a defense under *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Dkt. No. 51. Now that Dunn is represented in her individual capacity by a private firm, she seeks to amend her Amended Answer to add the government speech doctrine and Establishment Clause neutrality defense as defenses in this action. Dkt. No. 67.[8]

## II. DISCUSSION

### A. Standard to Amend

■■■ Fed. R. Civ. P. 15(a) states, in pertinent part, that leave to amend a pleading should be "freely given when justice so requires." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir.2003). Indeed, leave to amend should be denied only in the face of undue delay, bad faith, undue prejudice to the non-movant, futility of amendment, or where the movant has repeatedly failed to cure deficiencies in previous amendments.

---

**8.** Initially, this Court questioned whether either of these two defenses have to be pled as affirmative defenses. Conceptually, we felt because of the nature of the Complaint such defenses were inextricably intertwined and need not be pled. As an integral component of the oral arguments on the Motion to Dismiss, an Establishment Clause defense was discussed in considerable detail, and the Defendants raised the government speech doctrine on their appeal to the Second Circuit.

Such events support our perception that these two First Amendment defenses are implicitly part of this litigation without any special pleading designation. Upon a review by Defendant Martinez, he declined to submit a similar motion to amend as he felt that such amendments were not warranted. Nonetheless, since Dunn believes that such defense should be pled in her Answer, we will continue with our analysis.

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Kropelnicki v. Siegel,* 290 F.3d 118, 130 (2d Cir. 2002) (citing *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 271–72 (2d Cir.1996)). District courts are vested with broad discretion to grant a party leave to amend the pleadings. *See Local 802, Assoc. Musicians of Greater New York v. Parker Meridien Hotel,* 145 F.3d 85, 89 (2d Cir.1998). "The party opposing a motion for leave to amend has the burden of establishing that granting such leave would be unduly prejudicial." *New York v. Panex Indus., Inc.,* 1997 WL 128369, at *2 (W.D.N.Y. Mar. 14, 1997) (citing *Saxholm AS v. Dynal, Inc.,* 938 F.Supp. 120, 123 (E.D.N.Y.1996)); *see also Lamont v. Frank Soup Bowl,* 2000 WL 1877043, at *2 (S.D.N.Y. Dec.27, 2000) (citations omitted). This requires the non-movant to "do more than simply claim to be prejudiced." *Bryn Mawr Hosp. v. Coatesville Elec. Supply Co.,* 776 F.Supp. 181, 185 (E.D.Pa.1991).

Rule 15 is all encompassing and contemplates that answers would be amended as well to add both legal and equitable defenses. *Atiya v. Salt Lake County,* 988 F.2d 1013, 1018–20 (10th Cir.1993) (affirming the district court's grant of a motion to amend the answer to include the affirmative defenses of collateral estoppel and res judicata); *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,* 948 F.Supp. 263, 270 (S.D.N.Y.1996) (allowing the answer to be added to add equitable estoppel).

In challenging Dunn's Motion to Amend, CFF relies upon two grounds: (1) undue delay and prejudice and (2) futility.

### 1. Futility

■ The court has the discretion to deny a motion to amend, especially on the grounds of futility. *Nettis v. Levitt,* 241 F.3d 186, 193 (2d Cir.2001); *see also Marchi v. BOCES of Albany,* 173 F.3d 469, 478 (2d Cir.1999) (citing *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993)); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990).[9] The Second Circuit has stated where futility is raised as an objection to the motion to amend, and

> [w]here it appears that granting leave to amend is unlikely to be productive, it is not an abuse of discretion to deny leave to amend. *See, e.g., Foman v. Davis,* 371 U.S. at 182, 83 S.Ct. at 230 (denial not abuse of discretion where amendment would be futile); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("where … there is no merit in the proposed amendments, leave to amend should be denied"); *Billard v. Rockwell International Corp.,* 683 F.2d 51, 57 (2d Cir.1982) (denial not abuse of discretion where plaintiff had had "access to full discovery" in a related case).

*Ruffolo v. Oppenheimer & Co.,* 987 F.2d at 131.

■ As futility is an appropriate basis for denying leave to amend, such denial should be contemplated within the standards necessary to withstand a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir.2002) (citing *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir. 1991)). When amending an answer to add defenses, however, futility should be raised

---

9. The Second Circuit has stated that the district court does not abuse its discretion, as long as there is good cause, when they deny leave to amend pleadings on the basis of futility, bad faith, undue delay or undue prejudice. *Jin v. Metro. Life Ins. Co.,* 310 F.3d 84, 101–02 (2d Cir.2002) (denying leave to amend when motion was initiated four years after original complaint and when more than three years had passed since the close of discovery); *see also Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988).

in the context of a motion to strike pursuant to Fed. R. Civ. P. 12(f).[10] *In re Silicon Graphics, Inc.*, 363 B.R. 690, 700 (Bankr. S.D.N.Y.2007) (citing *Credit Suisse First Boston, LLC v. Intershop Comm'n AG*, 407 F.Supp.2d 541, 546 (S.D.N.Y.2006) for the proposition that denying a motion to amend to add an affirmative defense is proper when such amendments are insufficient as a matter of law). The distinction between the standards set forth in Rule 12(b)(6) and 12(f) are "semantic[al]" insofar as they are "mirror image[s]" of each other. *Credit Suisse First Boston, LLC v. Intershop Comm'n AG*, 407 F.Supp.2d at 546.

### 2. Prejudice

In determining what constitutes prejudice from the amendment of a pleading, courts within the Second Circuit generally consider "whether the assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir.2000) (quoting *Block v. First Blood Assoc.*, 988 F.2d 344, 350 (2d Cir.1993)). Courts will further consider whether the opponent was otherwise on notice of the new claim, and whether that claim derives from the same facts set forth in the original pleading. *See, e.g., Hanlin v. Mitchelson*, 794 F.2d 834, 841 (2d Cir. 1986); *Tokio Marine & Fire Ins. Co. v. Employers Ins.*, 786 F.2d 101, 103 (2d Cir.1986).

A delay in asserting an affirmative defense for a significant period of time

may result in a finding of prejudice. *United States v. Cont'l Illinois Nat'l Bank and Trust Co. of Chicago*, 889 F.2d 1248 (2d Cir.1989). Where the motion to amend is made after an "inordinate delay," a court has the discretion to deny leave of that amendment. *Travelers Indem. Co. v. Gosline*, 2003 WL 21230376, at *3 (N.D.N.Y. May 27, 2003) (citing *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir.1990)). In order to deny a motion to amend on the ground of delay, said ground must be accompanied by either bad faith or undue prejudice. *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993); *see also United States v. Cont'l Illinois Nat'l Bank*, 889 F.2d at 1254 (delay alone is an insufficient ground to deny a motion to amend). However, "the longer the period of an unexplained delay, the less will be required of the nonmoving party" to show undue prejudice. *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir.1983) ("The proper standard is one that balances the length of the delay against the resulting prejudice."). For example, if said amendment causes an undue prejudice by requiring additional discovery or unnecessarily complicates the litigation, the motion to amend may be denied. *Kovian v. Fulton County Nat'l Bank and Trust Co.*, 1992 WL 106814, at *2 (N.D.N.Y. May 13, 1992).

### B. Dunn's Undue Delay

Dunn did not file her Motion to Amend until after she sought and was permitted private counsel to defend her in her individual capacity. That permission and ultimate appointment of Hiscock & Barclay as her private lawyer did not occur until January 31, 2007, and prior to that date, the Attorney General represented all of the parties in all capacities, pre-

**10.** Rule 12(f) reads in part that "[u]pon a motion made by a party ... the court may order stricken from any pleading any insuffi-cient defense or any redundant, immaterial, impertinent, or scandalous matter."

senting a particularly uniform joint defense. CFF highlights the fact that the individual Defendants, particularly Dunn, waited nearly three years to decide to retain private counsel under the auspices of Public Officer's Law § 17. CFF goes as far as chastising Dunn for waiting so long to raise a conflict of interest with other Defendants and proclaims that she had an ethical obligation as an attorney to seek private counsel, with or without the State of New York agreeing to pay for the independent representation. As a result, CFF argues that Dunn's delay in requesting permission to hire independent counsel inextricably caused delays in discovery and ultimately has prejudiced it. As an illustration of such a delay, CFF reminds the Court of how Dunn's deposition scheduled for February 1, 2007, was abruptly canceled because Dunn's independent counsel had yet to be appointed and obviously would not have been prepared to proceed with the deposition. Dkt. No. 57, Pl.'s Lt., dated Jan. 26, 2007. Because the deposition had to be called off, this Court gave CFF permission to seek sanctions. Dkt No. 58, Text Order, dated Jan. 26, 2007. As such, delay in discovery and requiring additional discovery may be a basis to find undue prejudice, a reason to deny the proposed amendment. *Kovian v. Fulton County Nat'l Bank and Trust Co.*, 1992 WL 106814, at * 2.

Although there may have been delays in this lawsuit, those delays have not irretrievably compromised CFF's prosecution of this lawsuit, nor eliminated any remedies. Also, the degree of prejudice is nominal when we consider the future course of this litigation. This case has a long, meandering history and from our observation will not be resolved any time soon.

We acknowledge that the length of time it took for all of the individual Defendants to identify a conflict of interest so that independent counsel could be appointed appears to be considerable and regrettable. However, the Court was aware of Defendants' overtures for such appointments as those requests writhed themselves through the byzantine section 17 review process. As Dunn avers, the debate over permitting such appointment was ongoing for several months and her repeated efforts were "rebuffed" by the Attorney General's Office until January 31, 2007. Dunn's Decl. at ¶¶ 6 & 7. Further, as soon as Hiscock & Barclay where officially in this case, Dunn advised the Court of her desired to amend her Answer. Dunn cannot be credited with all of the blame for this delay. As to the Order granting permission to seek sanctions for the canceled deposition, realizing that CFF's counsel had already borne the cost of flying from Arizona to New York in order to conduct Dunn's deposition, we felt compelled to provide counsel with an opportunity to recover this cost and be made whole. CFF did not pursue the sanctions, presumably because counselor was able to change his flight with a minimal amount of cost. Thus, noting that permission to pursue sanctions was granted does not lend any material support to CFF's argument.

The timing and the volume of discovery will not be affected one iota because of the circuitous route pretrial litigation has already blazed. There are other delays already caused by mounting discovery and other pretrial litigation issues.[11] To remind the parties, there is an Appeal of this Court's Decision affecting Defendant Martinez pending before Judge McCurn. Dkt.

---

11. CFF cannot conveniently forget that most of the delay in this action is attributable to the Motion to Dismiss, the Motion for Reconsideration of an Order, and an Appeal to the Second Circuit of New York. Discovery did not commence in earnest until the Uniform Pretrial Scheduling Order was filed on June 5, 2006. Dkt. No. 45.

No. 84. A Motion to Compel CFF to respond to Dunn's Limited Interrogatories is pending. Dkt. No. 88. There is a gargantuan and complex Motion to Compel pertaining to approximately 350 documents claimed to be privileged, which Motion is yet to be fully briefed by all of the parties. Dkt. No. 113. Furthermore, this Court stayed any further discovery proceedings and adjourned deadlines pending a resolution of this Motion to Compel, which invariably also postponed a series of depositions. Depending on the resolution of the Motions to Compel, it is very probable that more discovery may ensue. Obviously, CFF's prosecution is impacted more greatly by these discovery postponements than Dunn's retention of independent counsel, pursuant to the Section 17 process. Moreover, we have yet to reach the stage of establishing a trial ready date. In light of these developments, CFF will not be expending any additional resources than already required; there will not be any delay in resolving this dispute; and Dunn's retention of private counsel does not prevent CFF from pursuing any other type of action. This Court does not find that Dunn acted in bad faith nor advanced any untoward prejudice for CFF. Hence, the argument of untimeliness and undue prejudice will not serve as a catalyst for denying Dunn's Motion to Amend.

## C. Government Speech Doctrine

■■■ Whether New York's sponsorship license plate program can deny CFF the opportunity to include on its proposed Picture Plate the catchphrase, "Choose Life," which may presuppose a religious pro-life message, is the chief contention of this litigation. As we know, Martinez repeatedly rejected CFF's application by identifying the proposed Picture Plate and its tag line as patently offensive and an unwarranted invitation for violent responses such as road rage. See Am. Compl at ¶¶ 50–70. CFF charges that when Defendants rejected its application, they were conducting impermissible viewpoint discrimination. Conversely, because government has a right to speak or not speak on its own behalf in the marketplace of ideas, a right commonly referred to as the government speech doctrine,[12] Dunn argues that New York can remain neutral in the polarizing abortion debate and eschew an appearance of taking a position in the emotionally charged and "partisan world of abortion politics" by refusing to counte-

12. The government speech doctrine and an individual's First Amendment Right to Free Speech are coterminous allowing for adaptation of each other's analytical foundation to support their respective actions or inactions. For example, government may resort to the First Amendment freedom of speech critique to amplify its reasons for speaking or not speaking on controversial matters:

A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complementary components of the broader concept of "individual freedom of mind."

*Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (citations omitted).

We mention this proposition because it seems to have been the thread of Defendants' argument throughout their oral arguments before Judge McCurn on the Motion to Dismiss and we certainly do not believe that Dunn has abandoned that line of thinking here. *See generally* Dkt. No. 17, Hr'g Tr. For example, Defendants were arguing logically and inferentially that some of the major First Amendment Free Speech cases support the government's right not to speak: "The logical conclusion is if an individual has to consent, there is no reason why the government wouldn't also have to consent[.]" (See Hr'g Tr. at pp. 22–24); "[T]he state needs to be able to decide what it says and how it says it, just as an individual has to be able to decide what kind of plate to put on one's car, or bumper sticker or whatever." (Hr'g Tr. at p. 70).

nance "Choose Life" gracing CFF's Picture Plate. Dkt. No. 67–5, Dunn's Mem. of Law at p. 11. If Defendants were to sanction such a Picture Plate, Dunn contends it would appear that New York State was endorsing a specific perspective on this controversial and divisive subject since the custom license plate program is a "paradigmatic example of government speech." *Id.* at p. 8. By not endorsing this pro-life slogan on this proposed Picture Plate, it is Dunn's view that New York was properly and constitutionally exercising its right to regulate the content of its own speech. In order to promote that proposition, Dunn argues that the custom license program itself constitutes government speech, which would afford New York proper authority, outside the purview of a First Amendment scrutiny, to decide not to issue "Choose Life" plates.

■■■■■ As a general rule, government has the undeniable right to speak for itself and to advocate and defend its own policies subject only to the review of the electoral and political processes. *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 235, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). When the government is the speaker, attributable solely to itself and not to others, it is free to make content based choices regarding such speech. *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). This liberty to chose its message sanctions a government's viewpoint based restriction. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541–42, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) (citing, *inter*

alia, *Rust v. Sullivan*, 500 U.S. 173, 194, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)). To constitute government speech, "government sets the overall message to be communicated and approves every word that is disseminated, [and by doing so] it is not precluded from relying on the government speech doctrine merely because it solicits assistance from non-governmental sources in developing specific messages." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 562, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005). That is, government can regulate the content of "what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. at 833, 115 S.Ct. 2510 ("When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee."). As a consequence of the government speech doctrine, when government exclusively crafts and controls its own speech, from "beginning to end," said speech is exempt from First Amendment scrutiny. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. at 560, 125 S.Ct. 2055. No matter how "one-sided" or lopsided government speech may be, as long as it does not infringe upon an individual's First Amendment Rights, it is constitutional. *Women's Emergency Network v. Bush*, 323 F.3d 937, 946 n. 9 (11th Cir.2003).[13] Stated another way, viewpoint based discrimination is not proper when the government does not itself speak but encourages, through various forums, a "di-

---

**13.** Succinctly put,

when the government speaks for itself and is not regulating the speech of others, it may discriminate based upon viewpoint … [but] government may not discriminate based on viewpoint when it regulates private speech.

*Planned Parenthood of South Carolina Inc. v. Rose*, 361 F.3d 786, 792 (4th Cir.2004) (citing, inter alia, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) & *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)).

versity of views from private speakers." *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. at 834, 115 S.Ct. 2510.

Actually, this Motion to Amend is not the first time in this litigation that Dunn and the other Defendants have invoked the government speech doctrine. As previously stated, when they appealed Judge McCurn's denial of their Motion to Dismiss to the Second Circuit, Defendants raised this issue then. Although lacking appellate jurisdiction to decide the qualified immunity defense in the context of a Rule 12(b)(6) Motion, the Second Circuit, nonetheless, addressed the government speech doctrine as to the alleged facts, finding that "it would not be reasonable for defendants to conclude this doctrine permitted viewpoint discrimination in this case." *Children First Foundation, Inc. v. Martinez*, 169 Fed.Appx. 637, 639 (2d Cir. 2006); *see supra* Part I.A. at p. 167 (for full quotation). First, rendering such conclusion, the Circuit, relying upon the contents of the Complaint as well as Defendants' argument, stated that the picture plate program is a nonpublic forum in which restrictions on speech must be reasonable and viewpoint neutral. 169 Fed. Appx. at 639. Without engaging in an extensive analysis of the issue, the Circuit further observed that "[a]lthough the government may discriminate on the basis of viewpoint when it is speaking only for itself ... custom license plates involve, at minimum, some private speech[.]" *Id.* (citing. *inter alia, Wooley v. Maynard*, 430 U.S. 705, 715, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) & *Perry v. McDonald*, 280 F.3d 159, 166–67 (2d Cir.2001)).

The legal ramification of the Second Circuit's finding that Defendants' invocation of the government speech doctrine is not reasonable appears to be ambiguous. Because the Circuit was reviewing the Appeal within a Rule 12(b)(6) motion to dismiss framework, and further considering that the Circuit ruled that it lacked appellate jurisdiction to weigh Defendants' assertion of qualified immunity, it is indeterminate whether the Second Circuit's discussion regarding the government speech doctrine deserves law of the case treatment or merits only consideration as dicta. It is also indefinite as to whether the Second Circuit meant to include this special license program within the rubric of "custom license plate" as discussed in *Perry v. McDonald* (deciding First Amendment issues as they pertain to vanity plates). If it was the Second Circuit's intent to broaden the ambit of custom license plates, then the appellate court was purposely signifying that this license program may reside outside the government speech realm. Certainly, the implication of its reflections on this legal matter cannot be ignored and we find that, in any case, it is eminently instructive. To appreciate the value of this instruction, we are compelled to view the continuum of instruction concerning free speech issues via license plates programs found in both *Wooley v. Maynard* and *Perry v. McDonald, inter alia,* cited by the Second Circuit as two significant precedents that may be controlling here.

The United States Supreme Court grappled with compelled private speech in *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752. Wooley brought an action seeking declaratory and injunctive relief against the enforcement of New Hampshire's statute that made it a crime to obscure the phrase "Live Free or Die" located on the state license plate. Wooley, a devote Jehovah's Witness whose religious belief found the state motto repugnant, blocked these words on his family's car, which caused him to be criminally prosecuted on several occasions. The Constitutional issue before the Supreme Court was whether the state may require an individual to participate "in the dissemi-

nation of an ideological message by displaying it on his private property[.]" *Id.* at 713, 97 S.Ct. 1428. In rendering its decision, and for the purpose of our case, the Supreme Court recognized the First Amendment feature of license plates that fundamentally "protects the right of individual to hold a point of view different from the majority[,] . . . to refuse to foster . . . an idea they find morally objectionable[,] [and to refuse] us[ing] their private property as a 'mobile billboard' for the State's ideological message[.]" *Id.* at 715, 97 S.Ct. 1428. Thus, *Wooley* is often cited as establishing the axiom that license plates may serve as a forum of personal expression.

Nevertheless, an individual does not have a *carte blanche,* unrestricted right to free speech as to the content of personal vanity license plates. Paula Perry claimed that Vermont violated her First Amendment Right when they revoked her vanity plate that contained a scatological reference. The Second Circuit ruled otherwise and its analysis is discernible for our case. *Perry v. McDonald,* 280 F.3d 159. It is axiomatic that government does not have to allow all forms of speech on its property but when it does try to regulate such private speech it must follow the evaluative process set by the United States Supreme Court. *Id.* at 166 (citations omitted). The Supreme Court has identified three forum categories and has developed a body of law commonly described as the forum analysis. Those three categories are (1) traditional public forum, an area devoted to assembly and debate, (2) designated public forum where government opens a nontraditional forum for public discourse, and (3) nonpublic forum. *Id.* at 166–67. Governmental regulation of private speech in a traditional public forum

and a designated public forum is subject to the close scrutiny test and requires a showing of a compelling state interest. *Id.* On the other hand, governmental restrictions on private speech in a nonpublic forum need only be reasonable and viewpoint neutral. *Id.* A vanity plate does not fall within either the traditional public forum or the designated public forum compartments but rather is more fitting as a nonpublic forum, and any restriction of speech thereon is subjugated to the reasonable and viewpoint neutral standard. *Id.* at 167–69.

In exercising the reasonableness and viewpoint neutrality standard to review Vermont's action to revoke Perry's vanity plate, the Second Circuit noted that automobile license plates are governmental property and government has a legitimate interest in not communicating a message that may be offensive. In reasonably prohibiting such expressive private speech, government may do so based upon content and "not on the basis of the speaker's viewpoint." *Id.* at 170 (citation omitted). In the final analysis, the Second Circuit found that Vermont did not discriminate against Perry on the basis of viewpoint. *Id.* at p. 175.[14]

Because *Perry* dealt with vanity plates, which are permitted to be personally customized and thus recognized as personal expressions, and in our case we are contending with a Picture Plate program designed, in part, to allow organizations to use the sale of the plates to raise money, to increase awareness about the organization, and to promote their causes, we wonder whether *Perry* is truly controlling here; there is a question whether *Perry* is dispositive as to special license programs such as New York State's even though it

---

**14.** The Second Circuit further found that this governmental restriction did not constitute a prior restraint on speech nor were Perry's due process rights violated. *Perry v. McDonald,* 280 F.3d at 175.

did not specifically state so. Even the parties here previously discerned that the facts in *Perry* and our case are distinguishable but admitted that *Perry* is "as close as we have in this Circuit to the situation at hand[.]" Hr'g Tr. at p. 17.[15] We are not prepared to unequivocally say that is actually what the Second Circuit prescribed for this case, extending *Perry* to special licensing programs. We are more disposed to treat the Circuit's Ruling as being highly persuasive dicta.

By seeking to assert the government speech doctrine in this case, Dunn indisputably does not want CFF's motto to be viewed solely as a private expression, for such designation unquestionably triggers a First Amendment forum analysis. And, if placing "Choose Life" on a New York license plate is construed as strictly government speech or even hybrid speech, viewpoint discrimination may remain a viable claim against Dunn and the other Defendants. Stated differently, if the speech pronounced on the license plate is deemed joint speech, Dunn contends, as the Defendants have done in the past, that forum analysis is not applicable. But neither the United States Supreme Court nor the Second Circuit have addressed this notion of hybrid speech. *Planned Parenthood of South Carolina, Inc. v. Rose*, 361 F.3d 786,

795 (4th Cir.2004) (noting that the United States Supreme Court has not recognized both government and private speech at the same time); *Arizona Life Coalition, Inc. v. Stanton*, 2005 WL 2412811, at *3 (D.Ariz. Sept.26, 2005) (also noting that neither the United States Supreme Court nor the Ninth Circuit have "addressed the issue on whether speech involving a specialty plate is government or private in nature"); *cf., The Women's Res. Network v. Gourley*, 305 F.Supp.2d 1145, (E.D.Cal. 2004) ("It is pellucid that the speech on the license plates authorized by these statutes 'is neither exclusively that of the private individuals nor exclusively that of the government, but, rather, hybrid speech of both.'"). To this extent, Dunn refers us to other case precedents to aid us in our analysis. We state at the outset that there is no agreement among the other Circuits. Rather the difference among them is palpably remarkable. The two most prominent Circuits who have entered into this discussion, the Fourth and Sixth Circuits, are at opposite ends of the analytical continuum.

Two cases arising out of the Fourth Circuit that merit our review as to the contest over the parameters of the government speech doctrine are *Sons of Confederate Veterans, Inc. v. Comm'r of the Vir-*

---

**15.** As to this issue, the colloquy before Judge McCurn, in part, was;

Judge McCurn: What is your basis for saying that the Second Circuit in *Perry v. McDonald*, 280 F.3d 159, 166 (2d Cir.2001) has already "analyzed and decided that special license plates in this jurisdiction constitute private speech?" Isn't that case readily distinguishable because the license plate at issue therein was a vanity plate, as opposed to a specialty plate. This case involves a specialty plate; is that right, our case? (Hr'g Tr. at p. 16).

Pl.'s Atty: That's correct.

Judge McCurn: Aren't vanity plates different from specialty plates in that they're one of a kind, making them inherently more individ-

ual and less likely to be viewed as having the imprimatur of the State? (Hr'g Tr. at p. 16).

Pl.'s Atty: Well, it is indeed clear that *Perry* is easily distinguishable for one because of the reason you cited, because it is individual vanity plates. (Hr'g Tr. at p. 17).

Defs.' Atty: I believe that *Perry*, of course, is distinguishable because the court was considering vanity plates and determined that those were private speech. We are not talking about vanity plates here. (Hr'g Tr. at p. 41).

Defs' Atty: But, again *Perry* found that vanity plates were private speech. We're not talking about a private speech here. That's distinguishable. (Hr'g Tr. at p. 67).

*ginia Dep't of Motor Vehicles,* 288 F.3d 610 (4th Cir.2002) and *Planned Parenthood of South Carolina Inc. v. Rose,* 361 F.3d 786 (4th Cir.2004), *cert. denied* 543 U.S. 1119, 125 S.Ct. 1036, 160 L.Ed.2d 1067 (2005). Under a specific specialty plate statute, Virginia authorized the issuance of a specialty plate to the Sons of Confederate Veterans (SCV) but within that statute restricted them from displaying the organization's emblem which includes a confederate flag. The plaintiff challenged the constitutionality of that restriction within this statute. Immediately, the Fourth Circuit recognized that no standard had "been enunciated ... by the United States Supreme Court for determining when the government is 'speaking' and thus able to draw viewpoint-based distinctions, and when it is regulating private speech and thus unable to do so." *Sons of Confederate Veterans, Inc. v. Comm'r of the Virginia Dep't of Motor Vehicles,* 288 F.3d at 618. Garnering guidance from other appellate courts, the Fourth Circuit adopted a four prong test to aid in deciphering the legal nature of the joint or hybrid speech:

> (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal" speaker;' and (4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech, in analyzing circumstances where both government and a private entity are claimed to be speaking.

*Id.* at 618 (citations omitted).

After a thorough analysis of the statute, under this four prong test, the Fourth Circuit concluded that the speech authorized on this specialty plate belonged to SCV and not Virginia and, based upon that finding, the court found Virginia's restriction presumptively unconstitutional. Even though the Circuit engaged somewhat in a forum analysis, it ultimately found that the logo restriction was indeed viewpoint discrimination, aimed at suppression of SCV's viewpoint, and could not withstand strict scrutiny. *Id.* at 626.

We now turn to *Planned Parenthood of South Carolina v. Rose,* 361 F.3d 786, in which the issues confronted by the Fourth Circuit are more analogous to our litigation. South Carolina enacted a statute that authorized a specialty license plate embossed with the words "Choose Life" while excluding the opportunity for a pro-life message to be imprinted on a similar plate. The petitioner disclaimed this statute as impermissible viewpoint discrimination. In an exhaustive decision, applying the four prong test identified above, the Fourth Circuit declared that this "Choose Life" specialty plate embodied both private and government speech, hybrid speech. Although the specialty license program was owned by the State and thus allowing some editorial control, the Circuit found that the literal speaker was the owner of the vehicle where this pro-life message would be displayed. South Carolina in effect provided a forum for those who embraced this pro-life message and then discriminated by precluding the antithetical message thereby promoting one viewpoint over another. This Circuit had reasoned that the State had opened a limited forum for expression and by limiting access to those only with a pro-life perspective, the "State ha[d] distorted the forum in favor of its own viewpoint." *Id.* at 799.

Speaking directly to the government speech doctrine, the Fourth Circuit found that

> upholding the Act would require an unwarranted extension of the government speech doctrine and of the State's power to promote some viewpoint above others.... The government speech doctrine was not intended to authorize

cloaked advocacy that allows the State to promote an idea without being accountable to the political process. *Id.* at pp. 795–96.

Although the Fourth Circuit concluded that South Carolina had engaged in impermissible viewpoint discrimination by "open[ing] [up] a limited forum for expression," "certain restrictions on speech within this forum [of license plates] are [still] reasonable and permissible" *Id.* at 799 (citing. *inter alia, Perry v. McDonald,* 280 F.3d 159). Another reasonable conclusion to be drawn from this case is that the Fourth Circuit has declared specialty license plates a forum for private expression where the government speech doctrine is inapplicable.

A contrary view, to which Dunn cites, may be found in *Am. Civil Liberties Union of Tennessee v. Bredesen,* 441 F.3d 370 (6th Cir.2006), *cert. denied,* 548 U.S. 906, 126 S.Ct. 2972, 165 L.Ed.2d 954 (2006). Tennessee, like South Carolina, enacted a specialty license plate statute permitting the pro-life shibboleth, "Choose Life." With no less of a comprehensive analysis, the Sixth Circuit concluded that there was no mixed speech as found in *Planned Parenthood* and that the anti-abortion message was indeed a government-crafted message with sole control of the content belonging to government and thus it was free to exercise discrimination based upon viewpoint. The court found that Tennessee did not create a forum to encourage private expression but rather "[relied] on private volunteers to express its policies, hence the statute was not subject to a First Amendment inquiry." *Id.* at 377.

Several other circuits and district courts have waded into these issues expressing divergent views and employing differing analyses.[16] Most noteworthy is a case from the District Court of Arizona that merits our examination insofar as it may be more factual on point with our case than any other. Arizona Life Coalition, Inc., much like CFF here, forwarded an application to Arizona's DMV to have a specialty plate that displayed its logo of two children's faces and the pro-life catchphrase, "Choose Life." *Arizona Life Coalition, Inc. v. Stanton,* 2005 WL 2412811 (D.Ariz. Sept.26, 2005). Raising the exact same concerns as our Defendants, Arizona DMV Commissioner was concerned that by granting this application the state would be endorsing a viewpoint it was not prepared to embrace to the exclusion of other abortion related viewpoints. The Commissioner denied the application, notwithstanding some minor revisions to the

---

**16.** In surveying related cases, we discovered several other cases indicating different perspectives on these issues. In *The Women's Res. Network v. Gourley,* 305 F.Supp.2d 1145 (E.D.Cal.2004), the district court found that the statements on license plates are hybrid speech with the governmental component of this joint speech trumping the private expression to the extent it was considered promoting California policy. Because it was deemed government speech, no First Amendment violation was established. Striking a converse view, the Northern District of Illinois, in an excellent discussion of the pertinent issues as to the presence of "Choose Life" on specialty plates, employing the four prong test, found that the message was private and not government speech, and where government provides a forum for private speech, the First Amendment is implicated and the governmental speech doctrine cannot prevail. *Choose Life Illinois, Inc. v. White,* 2007 WL 178455, at *7–8 (N.D.Ill. Jan.19, 2007); *see also Women's Emergency Network v. Bush,* 323 F.3d 937, 946 n. 9 (11th Cir.2003) (finding that the Florida program is structured to benefit the organization and not government, and observing that "[i]f the message on a license plate is private speech ... the First Amendment significantly constrains the State's ability to regulate the speech." The court "fail[ed] to divine sufficient government attachment to the message on Florida specialty license plates to permit a determination that the messages represent government speech.").

proposed plate. This district court availed itself of the four prong test to determine the nature of the speech, finding certain factors favoring governmental speech and others complimenting "some indicia of private expression." *Id.* at \*\*3–6. The court, after engaging in the First Amendment forum analysis and abandoning the notion that the governmental speech doctrine was applicable, eventually concluded that the "special organization plate," though governmental in nature, constituted a nonpublic forum subject to the tests of reasonableness and viewpoint neutrality. *Id.* at \*\*6–9, & \*11. Recognizing that DMV had a right to avoid the appearance of any favoritism in an otherwise nonpublic forum and maintain neutrality on the issue of abortion, the Arizona District Court ultimately resolved the issues favorably for Arizona's DMV Commissioner.[17]

■ After carefully culling through these precedents, we accept the legal proposition that a license plate specialty program with a category for organization and causes, such as found in New York, creates a nonpublic forum for private expression which implicates the First Amendment. We are especially persuaded by the Second Circuit dicta in this case ("it would not have been reasonable for defendants to conclude this [government speech] doctrine permitted viewpoint discrimination in this case"), supported by the Second Circuit ruling in *Perry v. McDonald,* the Fourth Circuit precedents of *Planned Parenthood* and *Confederate Veterans,* and the *Arizona Coalition* case, that the government speech doctrine, which would authorize view point discrimination, is not viable in this case and thus the proposed amendment to interject this doctrine into Dunn's Answer and this case would be futile. In accepting this position, we reject the Sixth

Circuit's reasoning and findings in *Am. Civil Liberties Union of Tennessee v. Bredesen.* *See Choose Life Illinois, Inc. v. White,* 2007 WL 178455, at \*7 (N.D.Ill. Jan.19, 2007) (finding that some aspects of the *Bredesen's* holding that specialty plates constituted government speech were "forced"). In this respect, this requested amendment is **denied.** By denying this proposed amendment, we are not stating that Dunn and the other Defendants are not without any First Amendment defense. It seems rather clear to this Court that the First Amendment test of reasonable and viewpoint neutrality is ever present in this litigation.

### D. Establishment Clause

Throughout CFF's application process, it has presented itself as an organization promoting adoption as a viable and desirable choice to abortion. It is CFF's view that the motto "Choose Life" is not solely emblematic of abortion but is also readily seen as advancing adoption. Conversely, Defendants, in rejecting CFF's application, have subtly though consistently interpreted the "Choose Life" slogan as "subject to varying interpretations at best" and the profligation of its message as primarily about adoption misleading. Dkt. No. 1, Compl., Ex. 10, Dunn's Lt., dated June 10, 2002, at p. 2. DMV "believe[d] that the phrase 'Choose Life' is more commonly associated with the abortion rights debate than it is with the promotion and funding of adoption." *Id.* To confirm DMV's position and the purported reason why this application was being declined, Defendant Martinez advised CFF that this phrase was contentious and a bellwether of a "very political, social, and religious issue[.]" Dkt. No. 1. Ex. 18, Martinez Lt., dated Mar. 31, 2004, at p. 2. And it has

17. Although we need not decide these issues since they are not before this Court on this Motion to Amend, we note that *Arizona Coali-* *tion* discussed the matters of due process, unfettered discretion, and equal protection under the law, the same complaints as here.

hardly been a secret throughout this litigation that Defendants perceived this proposed plate as predominately conveying a particular message on the controversial topic of abortion, and in that respect has a strong religious connotation. *See e.g.,* Hr'g Tr. at pp. 40 & 53. Because of this potential religious connotation, Dunn wants to officially assert the Establishment Clause Neutrality Defense embedded in the First Amendment into her Answer.

Dunn posits that Defendants are mandated to remain neutral as to the constitutional separation of church and state under the Establishment Clause. Because this proposed Picture Plate has an "unmistakably religious meaning," and the sponsorship license plate program "involves, at minimum, a substantial measure of government speech," Dunn postulates that this state by granting the application would either explicitly or implicitly be endorsing a predominate religious, "faith-based" message. Dunn's Mem. of Law at pp. 12–13. On the other hand, CFF argues that "Choose Life" license plates, which have been adopted by many other states, are not constitutionally defective under the Establishment Clause and states may either adopt a pro-life stance in furtherance of its own policy or allow private speakers in *fora* to encourage citizens to choose life. CFF's Mem. of Law at pp. 6–9.

 True, the First Amendment requires "governmental neutrality between religion and religion, and between religion and nonreligion. . . . When the government acts with the ostensible and predominant purpose of advancing religion, [or take sides], it violates that central Establishment Clause value of official religious neutrality[.]" *McCreary County, Ky. v. Am. Civil Liberties Union of Ky.,* 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005); *Ritell v. Vill. of Briarcliff Manor,* 466 F.Supp.2d 514, 525 (S.D.N.Y.2006) (quoting *McCreary County* ). By favoring one faith over another or religion generally, government sends an impermissible mixed message: believers or adherents are "insiders" while nonbelievers or nonadherents are "outsiders" the political community. *Id.* Although the Establishment Clause can justify content based restriction on speech, the United States Supreme Court has also observed that the Establishment Clause applies only to government speech and "has never been read . . . to serve as an impediment to purely *private* religious speech connected to the State only through its occurrence in a public forum." *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 761–62 & 767, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (emphasis in original). "Religious expression cannot violate the Establishment Clause where it (1) is purely private and (2) occurs in a traditional or designated public forum[.]" *Id.* at 770, 115 S.Ct. 2440.[18] Giving *Capitol Square Review* all

---

**18.** Justice Scalia writes that there is no violation when government enacts neutral policies that happen to incidentally benefit religion. *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 763–74, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). However, the value and degree of this neutral policy continue to be strongly debated among the Justices of the Supreme Court in both subsequent and concurring opinions. In this respect, the parameters of the Establishment Clause and the scope of neutrality are *still* in flux. *Cf. McCreary County, Ky. v. Am. Civil Liberties*

*Union of Ky.,* 545 U.S. 844, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (Souter, J.) & concurring opinions of Justice O'Connor in both *McCreary County* and *Capitol Square Review; see also Van Orden v. Perry,* 545 U.S. 677, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (Rehnquist, J.). For example, Justice Souter identified this problem when he wrote,

[t]he fair inference is that there was [or is] common understanding about the limits of the establishment prohibition, and the dissent's [Scalia and Thomas] conclusion that its narrower view was the original under-

of its due deference as a controlling precedent, we are still unable to comprehensively apply the scope of its ruling as to our case for a couple of reasons. First, as we have decided above, the custom license program may be a nonpublic forum and, if so, the ruling in *Capitol Square Review* would not be helpful since that decision dealt with "open forums." Second, we are unable to say at this juncture whether "Choose Life" is purely private or governmental speech, which as we have previously noted lacks party consensus, or possibly it may be hybrid speech. *See* Part II.C at pp. 173–79. And as we have already noted, the United States Supreme Court has not addressed any First Amendment issue as to simultaneous private and government speech and other courts are not unanimous on the determination of what constitutes joint speech and the legal implications thereof. If the facts support that "Choose Life" is bipartite speech, maybe the governmental component of the joint speech would be perceived as advancing religiosity and thus implicate the Establishment Clause.

Whether "Choosing Life" is governmental speech conveying a one sided, religious message is a "highly fact-specific" process, under the reasonable observer standard. *Skoros v. City of New York,* 437 F.3d 1, 29 (2d Cir.2006). The reasonable observer standard is an "objective standard" that is an integral component of the endorsement test—whether government is endorsing or sponsoring religion. *Jock v. Ransom,* 2007 WL 1879717, at * 19 (N.D.N.Y. June 28, 2007) (citations omitted). The fact-specific analysis concentrates upon the "perception of a reasonable, informed observer [who] must be

deemed aware of the history and the context of the community and forum in which the religious display appears." *Elewski v. City of Syracuse,* 123 F.3d 51, 53 (2d Cir. 1997) (quoting *Capitol Square Review,* 515 U.S. at 773–74, 115 S.Ct. 2440); *Jock v. Ransom,* 2007 WL 1879717, at *10 ("A reasonable observer must be 'fully cognizant of the history, ubiquity, and context of the practice in question.' ") (quoting *Skoros v. City of New York,* 437 F.3d at 24).

There is substance to the argument that "Choose Life," as a pro-life affirming tenet, in material respects, transmits a religious message. *Choose Life Illinois, Inc. v. White,* 2007 WL 178455, at *1 ("[I]t is not lost on this court that these words are also closely associated with the 'Right to Life/Anti–Abortion political point of view.' "); *Ariz. Life Coalition, Inc. v. Stanton,* 2005 WL 2412811, at *10 ("partisan world of abortion politics"). Only the most ill-informed person would find that the abortion debate does not have religious overtones and implications. It is also ineluctable that the abortion debate and even religion in every day life can be divisive. *McCreary County, Ky.,* 545 U.S. at 881, 125 S.Ct. 2722. The Establishment Clause was meant "to guard against the civic divisiveness that follows when the Government weighs in on one side of religious debate; nothing does a better job of roiling society[.]" *Id.* at 876, 125 S.Ct. 2722. Defendants and now Dunn reiterate that their decision not to grant CFF"s application was an attempt to be content-neutral.

It must be borne in mind that this Court is not deciding the correctness of Defen-

standing ... stretches the evidence beyond tensile capacity.... Today's dissent, however, apparently means that government should be free to approve the core beliefs of a favored religion over the tenets of others,

a view that should trouble anyone who prizes religious liberty.
*McCreary County,* 545 U.S. at 879–80, 125 S.Ct. 2722.

dants' decision to refuse CFF's application. And there are several issues we need not answer now, but to the extent that Dunn deems it necessary to include the Establishment Clause as an affirmative defense, she will be permitted to do so. Her inclusion of the Establishment Clause into this case is hardly a new concept to this litigation as it has been bantered about since Defendants made the decision to reject CFF's application and throughout this entire litigation. The proposed amendment is hardly futile.

## III. CONCLUSION

Because it appears that New York's custom license program "Take Your Pride For A Ride," directed at organization and causes, has created a forum, at least a nonpublic forum, for private expression, the government speech doctrine is not applicable in this case. With that said however, this Ruling does not preclude Dunn from proving that DMV's decision not to grant CFF's application was reasonable and content neutral. On the other hand, there is a *prima facie* showing that the custom license plate program may also be government speech and that the "Choose Life" message could have a religious message, which both factors could conceivably invoke the Establishment Clause Neutrality Defense. As there is no showing beyond doubt that Dunn cannot prove any set of facts in support of her proposed defense, we grant her permission to add this defense.

For the reasons stated herein, it is hereby

**ORDERED,** that Defendant Dunn's Motion to Amend her Answer (Dkt. No. 67) is **granted in part and denied in part** consistent with this Opinion; and it is

**ORDERED,** that Dunn serve and file her First Amended Answer within ten (10) days of the receipt of this Order; and it is further

**ORDERED,** that the Clerk of the Court correct the Docket Report regarding the parties consistent with the revised caption in this case and note 1.

**IT IS SO ORDERED.**